Slip Op. 14- 66

UNITED STATES COURT OF INTERNATIONAL TRADE

```
_____
                                 :
SIEMENS ENERGY, INC., et al.,    :
                                 :
        Plaintiffs,              :
                                 :
            v.                   :
                                 :
UNITED STATES,                   :
                                 :
        Defendant,               :
                                 :
            and                  :
                                 :
WIND TOWER TRADE COALITION,      :
                                 :
        Defendant-Intervenor.    :
_____  :
```

**PUBLIC VERSION**
Before: Mark A. Barnett, Judge

Consol. Court No. 13-00104

**OPINION**

[Plaintiffs challenge numerous aspects of the United States International Trade Commission's affirmative determination in the final injury investigation.  The court denies Plaintiffs' motions for judgment on the agency record.]

Dated:  ___6/17/2014___

Elliot J. Feldman, Baker Hostetler, of Washington, DC, argued for plaintiff Siemens Energy, Inc.  With him on the brief was Michael S. Snarr.

Ned H. Marshak, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, DC, argued for plaintiffs Titan Wind Energy (Suzhou) Co., Ltd., CS Wind Tech Co., Ltd., CS Wind Vietnam Co. Ltd., and Chengxi Shipyard Co., Ltd.  With him on the brief were Bruce M. Mitchell, Max F. Schutzman, Andrew B. Schroth, Andrew T. Schutz, and Kavita Mohan.

Michael K. Haldenstein, Attorney, Office of the General Counsel, U.S. International Trade Commission, of Washington, DC, argued for defendant.  With him on the brief

were <u>Dominic L. Bianchi</u>, General Counsel, and <u>Neal J. Reynolds</u>, Assistant General Counsel for Litigation.

<u>Daniel B. Pickard</u>, Wiley Rein LLP, of Washington, DC, argued for defendant-intervenor. With him on the brief were <u>Alan H. Price</u>, <u>Robert E. DeFrancesco, III</u>, and <u>Usha Neelakantan</u>.

Barnett, Judge:  Plaintiffs, Siemens Energy, Inc. ("Siemens"), Titan Wind Energy (Suzhou), CS Wind Tech, CS Wind Vietnam, and Chengxi Shipyard (collectively, "Titan"), move, pursuant to USCIT R. 56.2, for judgment on the agency record, challenging the United States International Trade Commission's ("Commission" or "ITC") affirmative determination in the final injury investigations in antidumping and countervailing duty investigations concerning utility scale wind towers ("wind towers") from the People's Republic of China ("China") and in an antidumping investigation of wind towers from the Socialist Republic of Vietnam ("Vietnam") published in *Utility Scale Wind Towers from China and Vietnam*, 78 Fed. Reg. 10,210 (ITC Feb. 13, 2013) ("*Final Determination*"), and the accompanying memorandum, *Utility Scale Wind Towers from China and Vietnam*, USITC Pub. 4372, Inv. Nos. 701-TA-486 and 731-TA-1195-1196 (Final) (Feb. 2013) ("*Views of the Commission*" or "*Views*").[1]  For the reasons stated below, the court denies Siemens' and Titan's motion.

_____

[1] All citations to the *Views of the Commission* are to the confidential version of the document.  All six Commissioners joined in sections I-VI of the *Views*. Section VII of the *Views* ("Material Injury By Reason of Subject Imports") represents the views of Chairman Williamson and Commissioner Aranoff.  Commissioner Pinkert issued a separate threat of injury determination, which will be cited hereafter as "*Pinkert Views*."

## BACKGROUND AND PROCEDURAL HISTORY

On December 29, 2011, the Wind Tower Trade Coalition[2] filed petitions

with the United States Department of Commerce ("Commerce") and the Commission,

seeking the imposition of antidumping and countervailing duties on wind towers

imported from China and antidumping duties on wind towers from Vietnam.  Commerce

issued notices initiating investigations on January 24, 2012.  *See Utility Scale Wind*

*Towers from the People's Republic of China and the Socialist Republic of Vietnam*, 77

Fed. Reg. 3440 (Dep't Commerce Jan. 24, 2012) (initiation of antidumping duty

investigations); *Utility Scale Wind Towers from the People's Republic of China*, 77 Fed.

Reg. 3447 (Dep't Commerce Jan. 24, 2012) (initiation of countervailing duty

investigation).  Following a preliminary investigation, the Commission issued a

preliminary determination on February 13, 2012, voting in a 5-0 decision that there was

a reasonable indication that an industry in the United States was threatened with

material injury by imports of wind towers from China and Vietnam.  *Utility Scale Wind*

*Towers from China and Vietnam*, 77 Fed. Reg. 9700 (ITC Feb. 17, 2012) (preliminary

determination).

In the final investigation, the Commission relied on data from certified

questionnaire responses from foreign producers of subject imports and from U.S.

importers and domestic producers of the like product.  The period of investigation

---

[2] The Wind Tower Trade Coalition consists of four domestic producers, Broadwind
Towers, Inc.; DMI Industries; Katana Summit LLC; and Trinity Structural Towers, Inc.

("POI") spanned 2009 through the first six months of 2012 ("interim 2012"). *Views* at 9

n.30. Six domestic producers submitted questionnaire responses, accounting for the

vast majority of U.S. shipments of wind towers during 2011.[3] Five Chinese and two

Vietnamese producers submitted questionnaire responses, providing data for almost all

subject imports during the POI.[4] Eleven U.S. importers submitted questionnaire

responses, representing over 95 percent of subject imports during the POI.[5]

Relying on this data, the Commission reached a divided final

determination. Four Commissioners found "no material injury," and two Commissioners

made affirmative determinations on the basis of "material injury." Three Commissioners

found "no threat of material injury," and one made an affirmative determination on the

basis of "threat of material injury."[6] Combined, the two affirmative determinations based

on material injury, by Chairman Williamson and Commissioner Aranoff, and the one

affirmative determination based on threat of material injury, by Commissioner Pinkert,

resulted in a final affirmative determination that the domestic industry was materially

injured or threatened with material injury by reason of Chinese and Vietnamese imports

of wind towers.

---

[3] The six domestic producers accounted for more than [[     ]] percent of U.S. shipments during 2011. *Views* at 4 (citing *Confidential Staff Report*, INV-LL-002 (Jan. 7, 2013) (revised by INV-LL-006, Jan. 11, 2013) ("*Staff Report*") at III-1 n.1).
[4] *Views* at 4 (citing *Staff Report* at VII-5, VII-11).
[5] *Views* at 4 (citing *Staff Report* at IV-1).
[6] The two Commissioners who made affirmative determinations on the basis of material injury did not make a threat of material injury determination.

The Commission defined wind towers as "large tubular steel towers that

are part of wind turbines."  *Views* at 6.  It elaborated:

> Wind turbines convert the mechanical energy of wind to electrical energy
> and are comprised of three main components – the nacelle, rotor, and
> tower.  The nacelle houses the wind turbine's main power generation
> components (the gearbox, generator, and other components), while the
> rotor typically consists of three blades and the hub.  The nacelle sits on top
> of the wind tower. . . . [W]ind towers within the scope of these investigations
> are 50 meters or more in height and designed to support the nacelle and
> rotor blades in a wind turbine with a minimum rated electrical power
> generation capacity in excess of 100 kilowatts.[7]

_____

[7] Commerce defined the scope of the imported merchandise under investigation in
further detail, as including:

> [C]ertain wind towers, whether or not tapered, and sections thereof. Certain
> wind towers are designed to support the nacelle and rotor blades in a wind
> turbine with a minimum rated electrical power generation capacity in excess
> of 100 kilowatts (''kW'') and with a minimum height of 50 meters measured
> from the base of the tower to the bottom of the nacelle (i.e., where the top
> of the tower and nacelle are joined) when fully assembled.

> A wind tower section consists of, at a minimum, multiple steel plates rolled
> into cylindrical or conical shapes and welded together (or otherwise
> attached) to form a steel shell, regardless of coating, end-finish, painting,
> treatment, or method of manufacture, and with or without flanges, doors, or
> internal or external components (e.g., flooring/decking, ladders, lifts,
> electrical buss boxes, electrical cabling, conduit, cable harness for nacelle
> generator, interior lighting, tool and storage lockers) attached to the wind
> tower section. Several wind tower sections are normally required to form a
> completed wind tower.

> Wind towers and sections thereof are included within the scope whether or
> not they are joined with nonsubject merchandise, such as nacelles or rotor
> blades, and whether or not they have internal or external components
> attached to the subject merchandise.

> Specifically excluded from the scope are nacelles and rotor blades,
> regardless of whether they are attached to the wind tower. Also excluded

*Views* at 6 (citing *Staff Report* at I-8 to I-9).  Despite limited interchangeability between

wind towers manufactured to different original equipment manufacturers' ("OEMs")

specifications, the Commission found that wind towers within the scope of the

investigation constituted a single domestic like product because they shared common

physical characteristics and uses, channels of distribution, manufacturing facilities,

production processes and employees, and producer and customer perceptions.  *Views*

at 7-8.  The Commission further determined that subject imports compete with each

other and the domestic like product.  *Views* at 11-14.

      Against this backdrop, two Commissioners made affirmative

determinations that subject imports had materially injured the domestic industry.  They

found that the volume and increase in volume of Chinese and Vietnamese wind towers

were significant in absolute terms and relative to domestic consumption and production.

*Views* at 27-30.  They further decided that these imports suppressed prices in the

domestic market, despite the absence of underselling and price depression on a total

delivered price basis.  *Views* at 30-35.  They thus determined that the subject imports'

high volumes and price effects had an adverse impact on the domestic industry over the

POI, and particularly during interim 2012.  *Views* at 35-42.  They concluded:

_____

      are any internal or external components which are not attached to the wind
      towers or sections thereof.

*Views* at 5-6 (citing *Utility Scale Wind Towers from the People's Republic of
China*, 77 Fed. Reg. 75,978 (Dep't Commerce Dec. 26, 2012); 77 Fed. Reg.
75,985 (Dep't Commerce Dec. 26, 2012); 77 Fed. Reg. 75,993-94 (Dep't
Commerce Dec. 26, 2012)).

> The increasing volumes of subject imports resulted in reduced growth in sales volumes and U.S. shipments and suppressed domestic price increases despite a robust growth in demand at the end of the period. Their effects have also included lower rates of capacity utilization, as well as declining market share and financial losses. . . .
>
> [Therefore,] we conclude that there is a causal nexus between the subject imports and the poor performance of the domestic industry. Consequently, we find that the domestic industry is materially injured by reason of subject imports.

*Views* at 42.

A third Commissioner made an affirmative determination on the basis that the subject imports posed an imminent threat of material injury to the domestic wind tower industry.  Weighing the statutory factors for finding threat, 19 U.S.C. § 1677(7)(F), he found, *inter alia*, that the subject imports competed in all major regions of the United States; Chinese and Vietnamese producers could accelerate production and delivery; subject import prices were trending downward; China had inventories of undelivered product; and subject import volume was significant and would likely increase significantly.  *Pinkert Views* at 3-8.  He found that demand for wind towers would soon moderate, such that "in the near future, it should take a much smaller volume of subject imports to constitute a significant share of the market than it took" during the POI.  *Pinkert Views* at 6.  He thus concluded that subject imports were likely to have an adverse impact on the domestic industry in the imminent future.  *Pinkert Views* at 7-8.  The two affirmative determinations based on material injury, combined with the third affirmative determination based on threat of material injury, resulted in a final affirmative injury determination.

Plaintiffs now challenge this *Final Determination* on several grounds.  (*See generally* Siemens Energy, Inc.'s Rule 56.2 Motion for Judgment on the Agency Record ("Siemens Mot."); Memorandum of Law in Support of Plaintiffs' Rule 56.2 Motion for Judgment Upon the Agency Record ("Titan Mot.").)  First, Siemens argues that the court should not defer to the Commission's affirmative determination because the determination did not arise from a majority vote for either material injury or threat of material injury.  (Siemens Mot. 14-18.)  Second, Titan and Siemens contest the material injury determination, alleging that the Commission improperly found that (1) the volume of subject imports displaced a significant volume of domestic wind towers; (2) competition from subject imports suppressed domestic wind tower prices; and (3) subject imports adversely impacted the domestic industry.  (*See generally* Siemens Mot.; Titan Mot.)  Third, they challenge Commissioner Pinkert's threat of material injury determination, alleging that he improperly found that the subject imports posed an imminent threat of material injury to the domestic wind tower industry.  (*See generally* Siemens Mot.; Titan Mot.)  The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1581(c).

## STANDARD OF REVIEW

An ITC determination is "presumed to be correct," and the burden of proving otherwise rests upon the challenging party.  28 U.S.C. § 2639(a)(1).  The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  It requires "'more than a mere scintilla,'" but "'less than the weight of the evidence.'"  *Nucor Corp. v. United States*, 34 CIT __, __, 675 F. Supp. 2d 1340, 1345 (2010) (quoting *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004)).  In determining whether substantial evidence supports the Commission's determination, the court must consider "the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'"  *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)). The Commission need not address every piece of evidence presented by the parties; absent a showing to the contrary, the court presumes that the Commission has considered all of the record evidence.  *Aluminum Extrusions Fair Trade Comm. v. United States*, 36 CIT __, __, 2012 WL 5201218, at *2 (2012) (citing *USEC Inc. v. United States*, 34 F. App'x 725, 731 (Fed. Cir. 2002)).

That a plaintiff can point to evidence that detracts from the agency's conclusion or that there is a possibility of drawing two inconsistent conclusions from the evidence does not preclude the agency's finding from being supported by substantial evidence.  *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933, 936 (Fed. Cir. 1984) (citing *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 619-20 (1966); *Armstrong Bros. Tool Co. v. United States*, 626 F.2d 168, 170 n.4 (C.C.P.A. 1980)).

Moreover, "when adequate evidence exists on both sides of an issue, assigning

evidentiary weight falls exclusively within the authority of the Commission." *Nippon

Steel Corp. v. United States*, 458 F.3d 1345, 1358 (Fed. Cir. 2006).  The court may not

"'even as to matters not requiring expertise . . . displace the [agency's] choice between

two fairly conflicting views, even though the court would justifiably have made a different

choice had the matter been before it *de novo*.'"  *Mitsubishi Materials Corp. v. United

States*, 20 CIT 328, 331, 918 F. Supp. 422, 425 (1996) (quoting *Universal Camera

Corp. v. NLRB*, 340 U.S. 474, 488 (1951) (ellipses in original)).  Thus, the court "may

not reweigh the evidence or substitute its own judgment for that of the agency."  *Usinor

v. United States*, 28 CIT 1107, 1111, 342 F. Supp. 2d 1267, 1272 (2004) (citation

omitted).

       Furthermore, when presented with a challenge to the Commission's

methodology, the court examines "not what methodology [Plaintiff] would prefer," but

"whether the methodology actually used by the Commission was reasonable."

*Shandong TTCA Biochem. Co. v. United States*, 45 CIT at __, __, 774 F. Supp. 2d

1317, 1329 (2011) (quotation marks omitted).  "As long as the agency's methodology

and procedures are a reasonable means of effectuating the statutory purpose . . . the

court will not . . . question the agency's methodology."  *Int'l Imaging Materials, Inc. v.

United States*, 30 CIT 1181, 1189 (2006) (quoting *Ceramica Regiomontana, S.A. v.

United States*, 10 CIT 399, 404-05, 636 F. Supp. 961, 966 (1986)) (first ellipses in

original).

The two-step framework provided in *Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 842-45 (1984), governs judicial review of the Commission's interpretation of the antidumping and countervailing duty statutes. *Nucor Corp. v. United States*, 414 F.3d 1331, 1336 (Fed. Cir. 2005). First, the court must determine "'whether Congress has directly spoken to the precise question at issue.'" *Heino v. Shinseki*, 683 F.3d 1372, 1377 (Fed. Cir. 2012) (quoting *Chevron*, 467 U.S. at 842). If Congress's intent is clear, "'that is the end of the matter . . . .'" *Id.* (quoting *Chevron*, 467 U.S. at 842-43). However, "if the statute is silent or ambiguous," the court must determine whether the agency's action "is based on a permissible construction of the statute." *Dominion Res., Inc. v. United States*, 681 F.3d 1313, 1317 (Fed. Cir. 2012) (citing *Chevron*, 467 U.S. at 842-43).

## DISCUSSION

I.      **The Tariff Act's Tie-Vote Provision**

      **a. Siemens' Contentions**

Siemens argues that the court should not defer to the Commission's affirmative determination because the determination did not arise from a majority vote for either material injury or threat of material injury. (Siemens Mot. 14-16.) Siemens points out that four of the six Commissioners found no material injury to the domestic industry, while just two of the six Commissioners found present material injury. (Siemens Mot. 16-17.) As to the "threat of material injury," only one Commissioner found threat, three found no threat, and the two who found material injury did not vote with respect to threat. (Siemens Mot. 17.) Thus, Siemens argues, the Commission reached an affirmative determination by aggregating the two material injury votes with

the single threat of material injury vote, even though these determinations arise from

different criteria and analyses.  (*See* Siemens Mot. 17-18.)  Although Siemens

concedes that the Tariff Act requires aggregation of material injury and threat of material

injury votes to reach an affirmative determination, it opposes judicial deference to an

affirmative determination reached in this manner. (Siemens Mot. 14-15).  Instead,

Siemens urges that the court should defer to the majority of Commissioners who made

negative determinations of material injury and threat of material injury.  (Siemens Mot.

15-16.)

        Siemens cites two cases for support.  It contends that *Wind Tower Trade*

*Coalition v. United States*, a recent Federal Circuit decision related to this case, held

that "'the ITC as a whole makes a finding'" of whether there is material injury.  (Siemens

Reply 7.)  As a result, disregarding "'two-thirds of the ITC's votes' flouts the purpose of

the statute." (Siemens Reply 7.)  Siemens also relies on *Nippon Steel Corp. v. United*

*States* in which the court stated, "'when the totality of the evidence does not illuminate a

black-and-white answer to a disputed issue, it is the role of the expert fact-finder – here

the majority of the Presidentially-appointed, Senate-approved Commissioners – to

decide which side's evidence to believe.'"  (Siemens Reply 6.)  Siemens argues these

cases indicate that the court should defer to the majority of Commissioners, here, the

four Commissioners who found no material injury, rather than the views of the two

Commissioners reflected on the views of the Commission.

### b. Analysis

The Tariff Act considers the Commission's voting pattern relevant in two

scenarios.  First, it is relevant under the section of the Act that explains how to

aggregate votes when the Commission is evenly-divided.  This section of the Act states:

> If the Commissioners voting on a determination by the Commission . . .
> are evenly divided as to whether the determination should be affirmative
> or negative, the Commission shall be deemed to have made an affirmative
> determination.  For the purpose of applying this paragraph when the issue
> before the Commission is to determine whether there is—
>
> (A)   material injury to an industry in the United States,
>
> (B)   threat of material injury to such an industry, or
>
> (C)   material retardation of the establishment of an industry in the
>        United States,
>
> by reason of imports of the merchandise, an affirmative vote on any of the
> issues shall be treated as a vote that the determination should be
> affirmative.

19 U.S.C. § 1677(11).  This section clearly provides that any affirmative vote for

material injury, threat of material injury, or material retardation of the domestic industry

"shall be treated as a vote that the determination should be affirmative" when the

Commissioners are evenly divided as to whether a determination is affirmative or

negative.  *See id.*  Thus, an affirmative determination need not arise from three

affirmative votes on the same basis, as long as there are at least three affirmative votes

on any of the three bases.  *See id.*

In the case of a divided vote by the Commission, as occurred here, this

statutory provision is important.  The provision defines an evenly divided vote as an

affirmative determination for purposes of determining whether an antidumping or

countervailing duty order will be put in place.  Moreover, it makes it clear that the

Commission shall be deemed to have made that affirmative determination.  The

standard of review to be applied by this court, as established by Congress, is whether

the determination of the Commission is "unsupported by substantial evidence on the

record, or otherwise not in accordance with law…"  19 U.S.C. § 1516a(b)(1)(B)(i).  By

making the standard of review applicable to court review of the determination of the

Commission (*see* 19 U.S.C. §§ 1516a(a)(2)(A)(i)(II), 1516a(a)(2)(B)(i)), and defining a

tie vote as affirmative and as the determination of the Commission (*see* 19 U.S.C. §

1677(11)), Congress made plain that the same standard of review is applicable to the

Commission determination even when it is based on a split, tie vote.

        The Commission's voting pattern also is relevant to the sections of the

Tariff Act that deal with the effective date of Commerce's antidumping and/or

countervailing duty orders when the Commission has reached an affirmative

determination.  *See* 19 U.S.C. §§ 1671e(a), 1673e(a) (providing parallel rules for

countervailing and antidumping duties, respectively); *see also Wind Tower Trade Coal.

v. United States*, 741 F.3d 89, 96-97 (Fed. Cir. 2014).  According to these sections, the

effective date of these orders may be retrospective, from the date the entries were

suspended (the "General Rule"), or prospective, from the date of publication of the final

Commission determination (the "Special Rule").  These Rules provide:

    (1)    General rule

        If the [Commission], in its final determination ... finds material injury
        or threat of material injury which, but for the suspension of
        liquidation ... would have led to a finding of material injury, then
        entries of the [subject merchandise], the liquidation of which has

been suspended ..., shall be subject to the imposition of ... duties....

(2)     Special rule

If the [ITC], in its final determination ... finds threat of material injury, other than threat of material injury described in paragraph (1), ... then [subject merchandise] which is entered, or withdrawn from warehouse, for consumption on or after the date of publication of notice of an affirmative determination of the [ITC] ... shall be subject to the [assessment or imposition] of ... duties ..., and [Customs] shall release any bond or other security, and refund any cash deposit made.

*Id.* §§ 1671e(b), 1673e(b).  "In other words, the General Rule applies if the ITC makes (1) an affirmative finding of present material injury, or (2) a finding of a threat of material injury that would have been a finding of present material injury ["but for"] provisional measures."  *Wind Tower*, 741 F.3d at 97.  The General Rule mandates that antidumping and countervailing duties be collected retrospectively on merchandise that entered the United States during the investigation.  *Id.*  In contrast, the Special Rule applies when the ITC finds a threat of material injury that would *not* be present material injury "but for" the application of provisional measures.  *Id.*  Under the Special Rule, antidumping or countervailing duties are collected prospectively, from the date the ITC publishes its final determination, and any provisional cash deposits are refunded.  *Id.*

In arguing that the court should not defer to an affirmative determination arising from a divided vote, Siemens conflates the Tariff Act provision dealing with tied votes with the sections dealing with the effective date of duties.  The tied-vote provision explicitly requires aggregation of material injury and threat of material injury decisions to reach an affirmative determination without regard to the "but for" findings in sections 1671e(b)(1) and 1673e(b)(1).  *See, e.g.*, *Metallverken Nederland B.V. v. United States*,

13 CIT 1013, 728 F. Supp. 730 (1989).  In contrast, the Tariff Act provision dealing with

the effective date of antidumping and countervailing duties emphasizes the importance

of the "but for" finding when the Commission makes a threat determination, but does not

explain how to treat a divided voting pattern.  *See Wind Tower*, 741 F.3d at 96-97; *see*

*also MBL (USA) Corp. v. United States*, 16 CIT 108, 113-14, 787 F. Supp. 202, 207-08

(1992).

      The cases that Siemens cites are inapposite as to whether the court

should decline to defer to a divided affirmative vote or otherwise apply some different,

less deferential, standard of review.  The *Wind Towers* case deals with the vagary of

how to treat a divided voting pattern when applying the General Rule or the Special

Rule for collecting duties.  *See* 741 F.3d at 97.  It does not address the issue of

deference to a divided affirmative vote.  *See generally id.*  Siemens also misstates the

significance of the *Nippon Steel* quote that "when the totality of the evidence does not

illuminate a black-and-white answer to a disputed issue, it is the role of . . . the majority

of the . . . Commissioners – to decide which side's evidence to believe."  458 F.3d at

1359.  *Nippon* does not concern the question of divided affirmative determinations, and

so the court's emphasis on the majority of Commissioners lacks the significance with

which Siemens would imbue it.

      The court sees no basis in the statute, precedent, or logic to apply a

different standard of review to affirmative determinations based on a divided vote than it

would apply to an affirmative determination in which a majority of the Commissioners

reached a common conclusion about the nature of the injury.  The language of 19

U.S.C. § 1677(11) provides no basis for treating an affirmative determination by a

divided Commission any differently than any other Commission determination.

Similarly, the standard of review provided in 19 U.S.C. § 1516a(b)(1)(B)(i) does not

suggest any distinction when reviewing a determination by a divided Commission.

Indeed, cases reviewing a determination by a divided Commission have applied the

same "substantial evidence" standard of review as used in cases with more uniform

voting patterns.  *See, e.g.*, *Metallverken*, 13 CIT 1013, 728 F. Supp. 730; *cf. Corus*

*Staal Bv v. United States*, 27 CIT 459, 2003 WL 1475045 (2003).

          This approach makes sense given the absence of a manageable

alternative standard of review.  Substantial evidence review acknowledges that

substantial evidence may exist to support different conclusions.  *See Matsushita*, 750

F.2d at 936 (citing *Consolo*, 383 U.S. at 619-20; *Armstrong Bros.*, 626 F.2d at 170 n.4);

*see also Metallverken*, 13 CIT at 1017, 728 F. Supp. at 734 ("It is well settled that

substantial evidence may exist in a record to support several inconsistent

conclusions.").  Substantial evidence review is not a vote counting exercise.  *See, e.g.*,

*Philip Bros., Inc. v. United* States, 10 CIT 485, 486, 640 F. Supp. 1340, 1342 (1986)

(finding that the "size of the Commission majority is . . . irrelevant" when reviewing the

determination and that the court "may consider only whether the determination of the

Commission is unsupported by substantial evidence").  Even when four Commissioners

are persuaded by certain evidence, it does not mean that a contrary vote by the other

two Commissioners cannot be supported by substantial evidence or that such

substantial evidence must be reviewed with less deference by this court.  Treating

affirmative determinations by a divided Commission differently from uniform

determinations would ask the reviewing court to engage in impermissible reweighing of

the evidence in such cases.  *See Usinor*, 28 CIT at 1111, 342 F. Supp. 2d at 1272; *see*

*also Metallverken*, 13 CIT at 1017, 728 F. Supp. at 734.  In *Metallverken*, which

presented the same voting pattern as the underlying determination, the court rejected

plaintiff's argument to negate an affirmative determination based solely on the findings

of the dissenting commissioners.  The court reasoned as follows:

> In asking the Court to negate a commissioner's determination based upon the
> findings of dissenting commissioners, plaintiffs are, in essence, asking the Court
> to reweigh the evidence.  The function of this Court is not to reweigh the
> evidence, but rather to ascertain whether the Commissioner's determination is
> "unsupported by substantial evidence on the record or otherwise not in
> accordance with law."

*Metallverken*, 13 CIT at 1017, 728 F. Supp. at 734 (citations omitted).  Thus, contrary to

Siemens' arguments, the court reviews the Commission's determination, no matter how

reached, based upon the substantial evidence standard.

## II.    The Material Injury Determination

Plaintiffs contest the Commission's material injury determination, alleging

that the Commission improperly found that (1) the volume of subject imports displaced a

significant volume of domestic wind towers; (2) competition from subject imports

suppressed domestic wind tower prices; and (3) subject imports adversely impacted the

domestic industry.  (*See generally* Siemens Mot.; Titan Mot.)

Pursuant to the Tariff Act, as amended, the Commission determines

whether a domestic industry is materially injured, or threatened with material injury, by

reason of unfairly subsidized or dumped imports.  *See* 19 U.S.C. §§ 1671d(b),

1673d(b).  The Commission will issue an affirmative determination if it finds "present

material injury or a threat thereof" and makes a "finding of causation."  *Hynix*

*Semiconductor, Inc. v. United States*, 30 CIT 1208, 1210, 431 F. Supp. 2d 1302, 1306

(2006) (quotation marks omitted).  In making a material injury determination, the

Commission evaluates "(1) the volume of subject imports; (2) the price effects of subject

imports on domestic like products; and (3) the impact of subject imports on the domestic

producers of domestic like products."  *Id.* (citing 19 U.S.C. §§ 1677(7)(B)(i)(I)-(III));

*accord GEO Specialty Chems., Inc. v. United States*, Slip Op. 09-13, 2009 WL 424468,

at *2 (CIT Feb. 19, 2009).  The Commission may also consider "'such other economic

factors as are relevant in the determination.'"  *Hynix Semiconductor*, 30 CIT at 1210,

431 F. Supp. 2d at 1306 (quoting 19 U.S.C § 1677(7)(B)(ii)).

### a.  Volume

In performing its volume analysis, the ITC must consider "'whether the

volume of imports of the merchandise, or any increase in that volume, either in absolute

terms or relative to production or consumption in the United States, is significant.'"

*Shandong TTCA Biochem.*, 45 CIT at __, 774 F. Supp. 2d at 1322 (quoting 19 U.S.C.

§ 1677(7)(C)(i)).

In its *Views*, the Commission assessed several metrics and determined

that the volume and the increase in volume of subject imports were significant, both in

absolute terms and relative to consumption.  *Views* at 27.  Specifically, the Commission

found that the volume of subject imports, by quantity, grew significantly between 2009

and 2011, and that "[t]he growth in subject imports in interim 2012 relative to interim

2011 was dramatic." *Views* at 27 (citing *Staff Report* at Table IV-2).[8]  The Commission

also observed that, although subject imports' U.S. market share fell slightly between

2009 and 2010, it increased significantly in 2011.  *Views* at 28 (citing *Staff Report* at

Table IV-6).  Likewise, subject imports' share of the U.S. market, by quantity, rose from

interim 2011 to interim 2012.  *Views* at 28 (citing *Staff Report* at Table IV-6).  The ratio

of subject imports to U.S. production similarly increased substantially both from 2009 to

2011 and from interim 2011 to interim 2012, despite an increase in U.S. production.

*Views* at 28 (citing *Staff Report* at Table IV-7).

        The Commission also considered domestic industry volume trends.  It

found that the domestic industry's volume decreased, despite an increase in demand in

interim 2012 prompted by the anticipated expiration of the investment tax credit and the

production tax credit ("PTC").  *Views* at 19-20 (citing *Staff Report* at II-11), 28-29.[9]  To

benefit from the PTC, the wind turbine had to be operational by the end of 2012.  *Views*

at 19-20 (citing *Staff Report* at II-11).  Thus, OEMs rushed to install wind towers to

benefit from the PTC, leading to a substantial increase in apparent U.S. consumption of

wind towers between interim 2011 and interim 2012.  *Views* at 28 (citing *Staff Report* at

Table IV-6).  Although the Commission acknowledged that the domestic industry's

market share rose somewhat between 2009 and 2011, it found that it was "far lower . . .

---

[8] Subject imports grew by 41.8 percent between 2009 and 2011 and increased from 456 towers to 1,257 towers from interim 2011 to interim 2012.  *Views* at 27 (citing *Staff Report* at Table IV-2).
[9] The PTC provided a 2.2 cents per kilowatt-hour credit for the first ten years of a wind turbine's operation.  *Views* at 20 (citing *Staff Report* at II-10 to II-11).

than at any prior point during the period of investigation" by interim 2012, dropping by more than [[  ]] points from interim 2011 to interim 2012.  *Views* at 28 (citing *Staff Report* at Table IV-6).  The Commission found that subject imports disproportionately benefited from the surge in demand, with their shipments increasing "even more sharply" than the rise in apparent U.S. consumption.  *Views* at 28 (citing *Staff Report* at Table C-1).

The Commission considered several alternative explanations for why domestic market share declined while subject import market share dramatically increased during the POI.  It considered, for example, that subject imports took market share from nonsubject imports.  *Views* at 28-29.  It found, however, that "[t]he increase in subject imports' share of the U.S. market . . . came primarily at the direct expense of the domestic industry rather than nonsubject imports," noting that nonsubject imports' market share declined from 2009 to 2011, and even by a small amount during interim 2012 when demand was peaking.  *Views* at 28-29 (citing *Staff Report* at Table IV-6). The Commission also rejected the possibility that the domestic industry's inability to supply the market accounted for the high levels of subject imports, observing that the domestic industry had excess capacity that would have allowed it to fill a greater share of demand than it did.  *Views* at 29 (citing *Staff Report* at III-18, Tables III-3, III-5, III-6, IV-2, Figs. E-1 to E-4).  It concluded,

> [w]hile factors such as operational inefficiencies and the expected non-renewal of the PTC and other federal incentives may have played some role in the domestic industry's modest growth in production and shipments during interim 2012, the record indicates that the subject imports also played a role in precluding the domestic industry from increasing production to take advantage of the increase in apparent consumption.

*Views* at 30 (citing *Staff Report* at III-18 n.33, VI-11; Hr'g Tr. (Cole) 81, 122-123).

The Commission thus determined that the volume and increase in volume of subject imports was significant during the POI.  *Views* at 30.

### i.  Tax Credit Argument

Titan argues that the anticipated expiration of the PTC and investment tax credit at the end of 2012 led to an anomalous surge in demand that domestic producers were unable to accommodate.  (Titan Mot. 5, 24-25, 36.)  Relying on the dissenting Commissioners' rationale, Titan contends that, "'[d]uring the latter half of the POI, subject imports filled demand that was itself inflated and accelerated by the likely expiration of the PTC and other federal incentives, but subject imports did not displace significant amounts of domestic production or sales.'"  (Titan Mot. 25.)  As a result, Titan urges that the Commission lacked substantial evidence to support its determination of a significant volume and increase in volume of subject imports during the POI.

However, the Commission acknowledged that the surge in demand at the end of the POI was particularly strong because of the anticipated non-renewal of the PTC.  *Views* at 28.  Citing substantial record evidence, it found that significant volumes of subject imports prevented the domestic industry from taking full advantage of this surge.  *Views* at 28.  It cited, for example, the increase in quantity of subject imports, *Views* at 27 (citing *Staff Report* at Table IV-2), and their growing market share during the POI, *Views* at 28 (citing *Staff Report* at Tables IV-6, C-1).  The Commission also relied on record evidence that showed subject imports' market share increased "more sharply" than demand between interim 2011 and interim 2012 while the domestic industry's market share fell to its lowest point during that timeframe.  *Views* at 28 (citing

*Staff Report* at Table IV-6, C-1).  The Commission considered and dismissed the

possibility that subject import market share grew at the expense of nonsubject imports,

finding that nonsubject imports lost a small amount of market share when subject

imports were increasing dramatically.  *Views* at 28-29 (citing *Staff Report* at Table IV-6).

These findings provide substantial evidence to support the conclusion of

significant volumes and increase in volumes of subject imports during the POI, both in

absolute terms and relative to consumption.  Relying on the dissenting Commissioners'

findings, Titan argues that the Commission determination is unsupported by substantial

evidence.  That Titan can point to evidence that detracts from the Commission's

conclusion, however, does not preclude the Commission's finding from being supported

by substantial evidence.  *Matsushita*, 750 F.2d at 936.  In fact, in light of the dissent of

three Commissioners, the court is hardly surprised that the record contains contrary

evidence.  Conflicting evidence, however, is insufficient for Titan to carry the day.  *Id*.

While the court must consider the record as a whole, when the Commission has based

its determination on substantial evidence and considered the evidence that fairly

detracts from its conclusion, the court may not displace the agency's choice.  *Mitsubishi*,

918 F. Supp. at 425.  Titan's arguments improperly ask the court to reweigh the record

evidence and, therefore, must be rejected.  *Usinor*, 28 CIT at 1111, 342 F. Supp. 2d at

1272.

### ii. Excess Capacity

Titan and Siemens challenge the Commission finding that the domestic

industry had excess capacity during the POI as unsupported by substantial evidence.

(*See* Siemens Mot. 44-55; Titan Mot. 25-36.)  They argue that the domestic industry

was unable to meet the spike in demand for wind towers, leaving purchasers with no

choice but to purchase subject imports.  (*See* Siemens Mot. 44-55; Titan Mot. 25-36.)

In support of this argument, Titan and Siemens cite record evidence that calls into

question the domestic industry's reported capacity.  (*See* Siemens Mot. 44-55; Titan

Mot. 25-36.)  For example, they point to record evidence that one company backed out

of orders, (Siemens Mot. 51-53), and that another company turned away orders from

domestic plants in 2010 and 2011 (Siemens Mot. 47-48).  Plaintiffs also note that a third

company reported excess capacity though it told OEMs it could not accommodate

certain projects, (Siemens Mot. 55), and had not yet constructed a facility for which it

reported capacity (Titan Mot. 28-29).  Similarly, Plaintiffs observe that a company

claimed capacity for a plant that lacked the staff to produce towers (Siemens Mot. 53-

54; Titan Mot. 29).  Based on these examples of delayed and declined orders, Plaintiffs

argue that OEMs were forced to pay premiums for subject imports because the

domestic industry lacked actual capacity.  (*See* Siemens Mot. 44-55; Titan Mot. 25-36.)

Notwithstanding these claims, the Commission cited substantial record

evidence corroborating domestic producers' reported excess capacity.  It reasonably

relied on the domestic producers' certified capacity data.  *See Views* at 4, 29-30.  This

data provided substantial evidence for the Commission's conclusion that the domestic

industry had excess capacity during the POI.

Further, the Commission reasonably addressed evidence that detracted

from the data upon which it relied.  It acknowledged that domestic producers were not

able to meet all of the growing demand, but found that OEMs elected to purchase wind

towers overseas despite available capacity among domestic producers.  *Views* at 29

(citing *Staff Report* at Tables III-3, III-5, III-6, Figs. E-1 to E-4).  For example, the

Commission observed that several qualified facilities operated at modest rates of

capacity utilization during interim 2012, *Views* at 30 n.169 (citing *Staff Report* at Table

III-5), and that one company built a facility that its expected customer declined to use,

*Views* at 30 n.170 (citing *Staff Report* at II-4 n.6, V-67).  Additionally, the Commission

found that domestic producers had no choice but to decline certain orders because of

the contractual obligations they had undertaken through long-term supply agreements

that they believed required them to reserve certain production capacity for particular

OEM customers.  *See Views* at 30 n.173 (citing *e.g.*, Hr'g Tr. (Cole) 81, 122-123).

When the OEMs later renegotiated these agreements, domestic producers were left

with unused excess capacity.  *See id.*[10]  In addition, the Commission noted that some

domestic producers submitted bids for large projects for which subject imports were

used, undermining Plaintiffs' allegations that these producers lacked capacity.  *Views* at

41 n.234 (citing *Staff Report* at II-4 n.6).  The Commission further determined that

concerns about the preparedness of certain domestic production were unfounded given

the two-year delivery horizon, the large number of towers involved, and the OEMs'

---

[10] For example, one large producer, [[     ]], could not operate at capacity because it
had a long-term supply agreement with [[   ]] that [[   ]] later renegotiated in favor of
purchasing more subject imports.  *Views* at 30 n.173 (citing *e.g.*, Hr'g Tr. (Cole) 81, 122-
123).  Meanwhile, [[  ]] lowered its prices per tower by over [[   ]] percent under this long-
term agreement.  OEMs similarly renegotiated contracts with [[
       ]].  *Views* at 30 n.171 (citing *Staff Report* at III-18 n.33, V-11).

decisions to qualify new facilities after production begins.  *Views* at 30 n.170.  Finally,

the Commission addressed and rejected the argument that domestic producers'

facilities were too far from the wind tower sites, noting several examples in which OEMs

relied on subject imports despite nearby domestic facilities with reported excess

capacity.[11]  *Views* at 29-30 (citing *Staff Report* at Tables V-1, V-2, V-5, III-5).

Thus, the Commission relied on substantial record evidence to conclude

that the domestic industry had excess capacity due to the significant volume and

increasing volume of subject imports.  Plaintiffs have not identified any error with the

Commission's analysis.  As discussed with respect to the standard of review applied by

this court, even if Plaintiffs may point to evidence relied on by the dissenters and

inconsistent with the Commission's conclusion, that does not preclude the

Commission's finding from being supported by substantial evidence.  *Matsushita*, 750

F.2d at 936; *Armstrong Bros.*, 626 F.2d at 170 n.4.  The court "may not reweigh the

_____

[11] [[     ]], for example, relied on subject imports for a Midwest project even though
Trinity had facilities with capacity in Iowa and Texas. *Views* at 29 (citing *Staff Report* at
Tables V-2, III-5).  [[     ]] also opted to supply its Shephard's Flats project entirely with
subject imports, even though [[          ]] had a nearby facility and Broadwind offered to
build a new facility to supply the project.  *Views* at 30 (citing *Staff Report* at II-4 n.6, V-
67).  Plaintiffs' claims that the [[                                                        ]] is
also without merit.  (*See* Siemens Mot. 54; Titan Mot. 29.)  While Plaintiffs accurately
note that the record indicates that there were only [[
      ]] (Titan Mot. 29 (citing *Staff Report* at III-29 n.53)), the record also indicates that
[[
                ]] (*See Staff Report* at III-29 n.53.)  Consequently, there was
substantial evidence to support the Commission's finding that this plant had excess
production capacity.

evidence or substitute its own judgment for that of the agency." *Usinor*, 28 CIT at 1111,

342 F. Supp. 2d at 1272.

### b.  Price Effects

When performing a price effects analysis, the ITC must consider (1)

whether there has been significant price underselling by the imported merchandise as

compared with the price of the domestic like product and (2) whether the effect of

subject imports otherwise depresses prices to a significant degree or suppresses prices

to a significant degree.  19 U.S.C. § 1677(7)(C)(ii).

The Commission evaluated the existence of underselling, price

depression, and price suppression.  It found that subject imports and the domestic like

product are generally substitutable, and compete for sales to OEMs.  *Views* at 31 (citing

*Staff Report* at II-19, II-31 to II-32).  It also noted that most OEMs ranked total cost, of

which f.o.b. prices are the largest component, as the most important factor in

purchasing decisions.  *Views* at 31 (citing *Staff Report* at Tables V-1, V-5).  Further, the

Commission observed that OEM pricing data indicated that subject imports generally

had lower f.o.b. prices than domestic towers, but that domestic towers were less

expensive on a delivered basis.  *Views* at 32 (citing *Staff Report* at Table V-1; Hr'g Tr.

(Dougan) 156-157).  Thus, the Commission found that subject imports were not

significantly underselling domestic products on a delivered basis.  *Views* at 32-33.  The

Commission likewise found that the subject imports did not have price depressing

effects on the domestic industry, concluding that unit value was an unreliable metric for

evaluating price depression in this case because the size of wind towers increased as

sale values increased over the period of investigation.  *Views* at 33.

However, the Commission found substantial record evidence of price

suppression because the domestic industry's ratio of cost of goods sold to net merchant

market sales ("COGS ratio") increased significantly during the POI.  *Views* at 34 (citing

*Staff Report* at Table VI-1).[12]  The Commission observed that the rising COGS ratio

coincided with the increasing volume of subject imports during 2011 and interim 2012.

*Views* at 34-35.  It found this trend to be discordant with the price increases it would

have expected given the inelastic nature of the wind tower market and the spiking

demand during the period.  *Views* at 35.

The Commission attributed the domestic industry's unexpected cost-price

squeeze to evidence that OEMs negotiated based on f.o.b. prices.  *Views* at 33-34

(citing Pet'r's Post-Hr'g Br., Ex. 2; Hr'g Tr. (Cole) 31-32; Hr'g Tr. (Smith) 37).  It

reasoned,

> There have also been instances where the OEMs have pressured the
> domestic producers to renegotiate their supply agreements to set lower
> prices or alter volumes in light of the availability of low-priced subject
> imports.  The small number of OEMs in the market, the importance to
> them of price in purchasing decisions, their pattern of negotiating prices
> with domestic producers, and the availability of alternative sources of
> supply in the market (the most prominent of which during the latter portion
> of the period of investigation was subject imports), placed pressure on
> domestic producers to discipline their prices in order to receive bid
> solicitations or orders.

––––––––––––––––––––––––

[12] The domestic industry's COGS ratio increased from [[    ]] percent in 2009 to [[      ]]
percent in 2010 to [[      ]] percent in 2011.  *Views* at 34 (citing *Staff Report* at Table VI-
1).  In interim 2011, this ratio was [[      ]] percent, and in 2012 it was [[        ]].  *Id.*

*Views* at 34 (citing *Staff Report* at II-23, III-11, III-12, VI-17 n.28).  Thus, the

Commission concluded that subject imports prevented the domestic industry from

raising prices during the POI, resulting in significant adverse price effects on the

industry.  *Views* at 35.

### i.  Price Suppression

Siemens challenges the Commission's determination of adverse price

effects as unsupported by substantial evidence because the Commission found no

evidence of significant price underselling, price depressing effects by subject imports, or

confirmed lost sales.  (Siemens Mot. 43-44.)  It further argues that the Commission's

price suppression determination is inconsistent with the finding that subject imports cost

more on a delivered basis.  (Siemens Mot. 44.)

However, the Commission did not need to find underselling, price

depression, or lost sales[13] to determine that the subject imports adversely affected the

domestic industry by suppressing prices.  *Cemex, S.A. v. United States*, 16 CIT 251,

260-61, 790 F. Supp. 290, 299 (1992) ("To require findings of underselling would be

inconsistent with the proposition that price suppression or depression is sufficient."),

*aff'd*, 989 F.2d 1202 (Fed. Cir. 1993).  Likewise, higher priced subject imports are not

inconsistent with price suppression.  *Maine Potato Council v. United States*, 9 CIT 293,

301-02, 613 F. Supp. 1237, 1245 (1985) (holding that higher quality imports may have

_____

[13] The Commission acknowledged the absence of confirmed lost sales, but pointed out
that it viewed the [[                         ]] as a sales opportunity that was lost during the
demand boom in interim 2012.  *Views* at 33 n.190, 41 (citing *Staff Report* at II-4 n.6).

price suppressing effects notwithstanding their higher price); *Allegheny Ludlum Corp. v. United States*, 24 CIT 858, 880-81, 116 F. Supp. 2d 1276, 1298-99 (2000) (postulating that higher, though declining prices for subject imports could have depressed prices). Indeed, the Commission explained that, in this case, subject imports suppressed prices because OEMs negotiated with domestic producers to lower their f.o.b. prices, which were higher than those of subject imports. *Views* at 34 (citing Pet'r's Post-Hr'g Br., Ex. 2; Hr'g Tr. (Cole) 31-32; Hr'g Tr. (Smith) 37).

The Commission reasonably found that subject imports suppressed domestic prices and Plaintiffs have not demonstrated any error in the Commission's assessment of the facts. The Commission's determination regarding the subject imports' price suppressing effects on the domestic industry is supported by substantial evidence. Thus, the court may not reweigh the record evidence or otherwise second-guess the Commission's reasonable explanation. *See Usinor*, 28 CIT at 1111, 342 F. Supp. 2d at 1272.

### ii. COGS Ratio

Titan challenges the Commission's methodology for finding price suppression. It argues that the Commission failed to show a causal link between the subject imports and the domestic industry's rising COGS ratio. (Titan Mot. 42-43.) Specifically, Titan contends that the COGS ratio cannot reliably show that subject imports suppressed domestic prices because the COGS ratio does not correlate with

the domestic industry's net sales on a year-to-year basis.  (Titan Mot. 42.)[14]  Titan

asserts that the lack of year-to-year correlation between subject import market share,

domestic industry market share, and the COGS ratio disrupts the causal link between

subject imports and any price suppressing effects the domestic industry may have

experienced.  (Titan Mot. 42.)  Titan postulates that operational inefficiencies prevented

the domestic industry from raising prices during this period rather than subject imports.

(*See* Titan Mot. 46; *see also* Siemens Mot. 35-37, 58.)

         However, the Commission reasonably relied on the rising COGS ratio as

evidence of price suppression.  *See, e.g.*, *Nippon Steel*, 458 F.3d at 1354 n.4 ("When

cost of goods sold ('COGS') exceeds price, the producer is unable to sell the product for

more than what it costs to produce the product; if the producer is unable to raise prices,

the industry finds itself in what is referred to as a cost-price squeeze."); *Chlorinated*

*Isocyanurates from China and Spain*, Inv. Nos. 731-TA-1082-1083 (Final), USITC Pub.

3782 (June 2005) at 30 (finding that rises in unit COGS and in ratio of COGS to net

sales indicates cost-price squeeze).  Indeed, the Commission articulated a sufficient

causal link between the subject imports and the domestic industry's rising COGS ratio.

It focused on the trend of volume increases and elevated COGS ratios in 2011 and

interim 2012, not across the entire POI.  *Views* at 35-36.  The Commission observed

---

[14] For example, Titan notes that between 2009 and 2010, subject import market share
decreased while domestic COGS increased by [[     ]] points.  (Titan Mot. 42 (citing *Staff
Report* at Tables C-1 and C-2).)  And, between 2009 and 2011, domestic market share
increased while COGS increased.  (Titan Mot. 42 (citing *Staff Report* at Tables C-1 and
C-2).)  Further, during interim 2011 and interim 2012, domestic market share decreased
while COGS decreased.  (Titan Mot. 42 (citing *Staff Report* at Tables C-1 and C-2).)

that the COGS ratio increased from 2009 to 2011, remaining very high in interim 2012.

*Views* at 34 (citing *Staff Report* at Table VI-1).  The Commission found that the high

COGS ratio in 2011 and interim 2012 coincided with dramatic increases in subject

import volumes.  *Views* at 34-35 (citing *Staff Report* at Table VI-1).  There is no support

for Titan's argument that there must be a perfect correlation between subject imports

and COGS on a yearly basis.  The Commission may reasonably rely on the trend of

volume increases and elevated COGS ratios as it did here.

       Furthermore, the Commission reasoned that the domestic industry should

have been able to raise prices during 2011 and interim 2012 given the spike in demand,

but found it could not because of competition with subject imports.  *Views* at 34-35

(citing *Staff Report* at Table V-2).  The Commission acknowledged that operational

inefficiencies contributed to the domestic industry's inability to raise costs, but

concluded that these issues did not account for the entirety of the cost-price squeeze.

*Views* at 34-35.[15]  Rather, the Commission found that market conditions, such as the

small number of OEMs, the importance of price in purchasing decisions, negotiations

based on f.o.b. pricing, and the availability of subject imports, "placed pressure on

domestic producers to discipline their prices in order to receive bid solicitations or

orders."  *Views* at 34.  It determined that the changes in the COGS ratio reflected this

price suppressive effect.  *Views* at 34-35.

---

[15] Moreover, the Commission found that at least some of these inefficiencies resulted
from OEM customers pressuring domestic producers to change production designs to
accommodate their shift to subject imports for designs previously supplied by the
domestic producer  *Views* at 34 n.195 (citing *Staff Report* at VI-17 n.28).

The Commission examined the relevant data and articulated a reasonable explanation.  To that end, the Commission established a sufficient causal link between the subject imports and the domestic industry's rising COGS ratio.  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also* Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103–316, at 156 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4184–85 ("SAA") (stating that the Commission "need not isolate the injury caused by other factors from injury caused by unfair imports ... [r]ather, the Commission must examine other factors to ensure that it is not attributing injury from other sources to the subject imports").  Plaintiffs' ability to point to evidence that detracts from the Commission's findings, evidence that was examined and discounted by the Commission, does not provide a justification for this court to reweigh the evidence that was before the Commission.  *Usinor*, 28 CIT at 1111, 342 F. Supp. 2d at 1272 (2004); *see also Matsushita*, 750 F.2d at 936.

### iii. F.O.B. and Delivered Costs Argument

Plaintiffs next argue that the Commission lacked substantial evidence to support its determination that OEMs negotiated with domestic producers based on f.o.b. prices, thereby preventing price increases.  (Siemens Mot. 43; Titan Mot. 38-41.)  They argue that delivered costs were more important to OEMs than f.o.b prices, and that domestic wind towers were less expensive on that basis.  (Titan Mot. 41.)  Titan further observed that domestic producers could not have known about the f.o.b. prices quoted by their subject import competitors because OEM price negotiations were closed.  (Titan Mot. 40-41.)  Titan urges that the fact that OEMs attempted to reduce prices through

negotiations does not constitute the requisite causal link between subject imports and domestic prices.  (Titan Mot. 41.)  Moreover, Siemens argues that the Commission based its assessment of OEM negotiation patterns entirely on a misreading of a single email.  (Siemens Mot. 43.)

        Contrary to Plaintiffs' contentions, the Commission relied on substantial evidence to determine that subject imports' lower f.o.b. prices gave OEMs leverage in negotiating with domestic producers, thereby suppressing domestic prices.  The Commission acknowledged that subject imports were more expensive on a delivered basis, *Views* at 32-33 (citing *Staff Report* at V-1, V-2, V-6), but cited record evidence that f.o.b. price was the biggest component of total cost and that OEMs negotiated based on those prices. *Views* at 33-34 (citing Pet'r's Post-Hr'g Br., Ex. 2; Hr'g Tr. (Cole) 31-32; Hr'g Tr. (Smith) 37).  These negotiations pressured domestic producers to lower prices to compete with subject imports.  *Id*.  Though bids were closed, the Commission cited hearing testimony that OEMs leveraged quotes from other producers to drive f.o.b. prices down.  *Id*.  Further, the Commission found that OEMs pressured domestic producers to renegotiate supply agreements to set lower prices or alter volumes based on lower priced subject imports.  *Views* at 34 (citing *Staff Report* at II-23, III-11, III-12).[16]

_____

[16]  For example, the Commission found that [[



                                                                                      ]] *Views* at 34 n.195 (citing *Staff Report* at V-17 n.28).  It also found that [[   ]] awarded bids to subject import producers over [[                         ]] even though these

Thus, the Commission examined the relevant data and articulated a reasonable

explanation for its determination that was supported by substantial evidence.  *See*

*Motor Vehicle Mfrs.*, 463 U.S. at 43.

### c. Adverse Impact

In examining the impact of subject imports, the Commission "shall

evaluate all relevant economic factors which have a bearing on the state of the

industry," including output, sales, inventories, ability to raise capital, research and

development, and factors affecting domestic prices.  19 U.S.C. § 1677(7)(C)(iii).  No

single factor is dispositive, and all are considered "within the context of the business

cycle and conditions of competition that are distinctive to the affected industry."  *Id.*

The Commission found that subject imports adversely affected the

domestic industry during the POI based on these factors and considerations.  *Views* at

36.  It determined that "the domestic industry was unable to benefit from the sharp

increase in apparent U.S. consumption before the PTC was expected to expire" and

"experienced a decline in market share and only a modest increase in production and

U.S. shipments" as a result of significant volumes of subject imports during the POI, and

especially in interim 2012.  *Views* at 36.  The Commission further observed that the

domestic industry was unable to raise prices because of the presence of subject imports

and pressure by OEMs to lower f.o.b. prices to better compete with subject imports.

_____

domestic producers could have had new plants ready to produce towers within the two-
year delivery timeframe.  *See Views* at 30, 30 n.170 (citing *Staff Report* at II-4 n.6, V-
67).

*Views* at 36.  As a result, the domestic industry was unable to cover increased costs,

causing steep declines in operating income and resources available for capital

expenditures.  *Views* at 36.  The Commission evaluated whether other factors – non-

subject imports, operational inefficiencies, and the geographic location of projects – may

have harmed the industry during the POI, but found that these other factors accounted

for only a part of the adverse impact the domestic industry experienced.  *See Views* at

40-41.  The Commission concluded that the "record contains ample evidence that the

presence of the subject imports led to reduced production levels, shipments, capacity

utilization and price increases for the domestic industry as the OEMs turned to subject

imports rather than rely upon the domestic producers who had nearby unused capacity."

*Views* at 42.

### i.  Excess Capacity

Plaintiffs challenge the Commission's adverse impact finding on the basis

that the industry did not have excess capacity and actually gained market share

throughout the POI.  (*See* Siemens Mot. 44-55; Titan Mot. 25-36.)  In particular,

Plaintiffs argue that data showing excess capacity did not reflect actual market

conditions, noting that OEMs paid a premium for subject imports and that U.S.

producers refused and canceled orders throughout the period.  (*See* Siemens Mot. 44-

55; Titan Mot. 25-36.)

As discussed previously in reviewing the Commission's volume and price

effects analysis, Plaintiffs' arguments that the domestic industry lacked excess capacity

cannot withstand the standard of review.  The Commission relied on substantial record

evidence from the domestic industry's certified questionnaire responses to support its finding of excess capacity. *Views* at 40 (citing *Staff Report* at Tables III-5, III-6). It also had substantial evidence to support its determination that subject imports suppressed domestic industry prices because OEMs used subject imports' lower f.o.b. prices as leverage in negotiations with domestic producers. *Views* at 33-34, 36 (citing Pet'r's Post-Hr'g Br., Ex. 2; Hr'g Tr. (Cole) 31-32; Hr'g Tr. (Smith) 37). The Commission cited record evidence that domestic producers refused and canceled orders because of long-term supply agreements with OEMs that tied up their production. These domestic producers were then left with excess capacity when the OEMs subsequently renegotiated downward the quantity of wind towers they would purchase from the domestic producers and increased their purchases of subject imports. *See Views* at 30 n.171, n.173 (citing Hr'g Tr. (Cole) 81, 122-123; *Staff Report* at III-18 n.3, V-11). The Commission thus had substantial evidence to support its *Views.* Plaintiffs have not identified any error in the Commission's analysis and, instead, simply disagree with the outcome of that analysis. The court may not reweigh the evidence, as Plaintiffs request. *Usinor*, 28 CIT at 1111, 342 F. Supp. 2d at 1272.

### ii. Market Share

Plaintiffs argue that the Commission lacked substantial evidence to support its determination that the domestic industry's market share declined as a result of increased subject imports. Titan argues that subject imports could not have adversely affected the domestic industry given that domestic producers gained market share throughout the POI. (Titan Mot. 46.) Siemens urges that the Commission should

have viewed any loss in market share in the context of overall expansion of demand

that saturated domestic production capacity, such that "any further growth necessarily

meant a decline in domestic market share with no implications for the domestic

industry's prosperity."  (Siemens Mot. 41-42.)

        The Commission acknowledged that domestic market share grew

throughout most of the POI, but found that the domestic industry lost market share

during interim 2012, when demand was spiking.  *Views* at 37-38.  As previously

discussed, the Commission also found that the domestic industry had excess capacity

during this period, indicating that growth in market share did not have to go to subject

imports, as Siemens contends.  *Views* at 40.  The Commission reasonably found that

the domestic industry's market share declined as a result of increased subject imports.

Because the Commission's determination is supported by substantial evidence, the

court may not reweigh the record evidence by second-guessing the Commission's

reasonable explanation.  *See Usinor*, 28 CIT at 1111, 342 F. Supp. 2d at 1272.

### iii.   Non-Subject Imports

        Siemens also challenges the Commission's finding of adverse impact by

revisiting the contention that the Commission insufficiently analyzed the role of non-

subject imports in domestic market trends.  (Siemens Mot. 59.)

        As addressed earlier, the Commission considered the role of non-subject

imports and found that they did not have an adverse impact on the domestic market

during the POI.  The Commission determined that "nonsubject imports lost market share

throughout the period of investigation" and "[a]t the same time that subject imports were

generally increasing, nonsubject imports' share of the market was declining." *Views* at

23, 28 (citing *Staff Report* at Tables IV-2, IV-6; Tr (Revak) 226).  Based on this record

evidence, the Commission concluded that non-subject imports could not have caused

the adverse impact that the domestic industry experienced during the POI.  The

Commission instead decided that the "increase in subject imports in interim 2012

relative to interim 2011 came almost entirely at the expense of the domestic industry,

while nonsubject imports remained a minor factor in the growing U.S. market." *Views* at

40 (citing *Staff Report* at Table C-2).  Because the Commission relied on substantial

record evidence to support its conclusion about the role of non-subject imports, the

court may not reweigh the record evidence.  *Usinor*, 28 CIT at 1111, 342 F. Supp. 2d at

1272.

### III.   The Threat of Material Injury Determination

In determining whether a domestic industry is threatened with material

injury by reason of subject imports, the Tariff Act requires the ITC to consider, "among

other relevant economic factors," (i) the nature of any countervailable subsidy; (ii) any

existing unused production capacity or imminent, substantial increase in production

capacity in the exporting country, taking into account the availability of other export

markets to absorb any additional exports; (iii)  a significant rate of increase of the

volume or market penetration of the subject merchandise; (iv) the likely price effects of

the subject imports; (v) inventories of the subject imports; (vi) the potential for product-

shifting in facilities currently being used to produce other products; (vii) if the

investigation involves raw agricultural products, any product processed from such

products; (viii) the actual and potential negative effects on the existing development and

production efforts of the domestic industry; and (ix) any other adverse trends that

indicate that material injury by reason of subject imports is likely.  19 U.S.C.

§ 1677(7)(F)(i).  Though the presence or absence of any factor is not decisive, "a

determination may not be made on the basis of mere conjecture or supposition."  *See*

19 U.S.C. § 1677(7)(F)(ii).[17]

        In his *Views*, Commissioner Pinkert weighed the relevant statutory factors

and determined that wind tower imports from China and Vietnam posed a threat of

material injury to the domestic industry.  *See generally Pinkert Views*.  Focusing on

market conditions at the end of the POI, he found that the domestic industry was

vulnerable to material injury in the imminent future because foreign producers had, *inter*

*alia*, significantly increased volumes and market share; significantly and rapidly

expanded their presence throughout the U.S. market, even in regions where they did

not traditionally compete; generated substantial excess capacity that could quickly be

directed at the U.S. market; and accumulated significant inventories.  *Pinkert Views* at

3-6.  Commissioner Pinkert further observed that the price differential between the

---

[17] 19 U.S.C. § 1677(7)(F)(ii) states:

> The Commission shall consider the factors set forth in clause (i) as a whole
> in making a determination of whether further dumped or subsidized imports
> are imminent and whether material injury by reason of imports would occur
> unless an order is issued or a suspension agreement is accepted under this
> subtitle. The presence or absence of any factor which the Commission is
> required to consider under clause (i) shall not necessarily give decisive
> guidance with respect to the determination. Such a determination may not
> be made on the basis of mere conjecture or supposition.

domestic product and subject imports narrowed during this timeframe and that demand

for wind towers in the foreseeable future was expected to moderate from the 2012 high.

*Pinkert Views* at 6-7.  In this context, he determined that subject import volumes will

likely be significant in the imminent future, leading to increased price competition with

the domestic industry.  *Pinkert Views* at 7-8.  He concluded:

> Limited sales opportunities in a less than robust market will intensify price
> competition between subject imports and domestic producers, and even a
> modest volume of subject imports would be likely to result in negative
> effects on the domestic industry. As a consequence, in the absence of
> trade relief, the industry is likely in the imminent future to suffer a
> significant loss of revenues that will cause a further deterioration in its
> financial condition, as well as declining employment, output, and
> productivity.

*Pinkert Views* at 8.

Plaintiffs challenge Commissioner Pinkert's determination, arguing that he

lacked substantial evidence to support a finding that injury to the domestic market was

"imminent"; improperly extrapolated conditions from interim 2012 in finding imminent

threat; and lacked substantial evidence to support the statutory factors that he found

indicated an imminent threat of material injury to the domestic market.  (*See generally*

Siemens Mot.; Titan Mot.)  Thus, they argue that his findings, as a whole, rest on

speculation and conjecture.  (*See generally* Siemens Mot.; Titan Mot.)

### a.  "Imminent" Material Injury

In his Views, Commissioner Pinkert found that the termination of the PTC

and the investment tax credit in 2012, and their one-year renewal for 2013, would cause

demand to moderate in the near future.  He reasoned:

> [I]t should take a much smaller volume of subject imports to constitute a significant share of the market than it took during the period of heightened demand in 2011 and 2012 leading up to the then-expected end of the PTC and [investment tax credit].  Given moderate demand, subject producers are likely to compete intensely for U.S. sales in order to better utilize their available capacity.  Consequently, for the above reasons, I find that, in the absence of trade relief, imports of the subject merchandise in the imminent future are likely to be significant and to increase significantly, both in absolute terms and relative to consumption, over the low-to-nonexistent levels to which they fell as a result of expectations that the PTC and [investment tax credit] would not be renewed.

*Pinkert Views* at 6 (citing *Staff Report* at II-10, Table VII-9).  He further indicated that

such increased volumes of subject imports were imminent because "it would likely take

six to nine months for purchasers to respond to the renewal of the PTC with new

orders."  *Pinkert Views* at 6-7 n.27 (citing Hr'g Tr. (Smith) 80).

Siemens urges that the harm Commissioner Pinkert predicted could not

occur imminently because a year or more would pass between planning projects in

response to the renewed tax credits and delivery of towers.  (Siemens Mot. 25-26.)  It

argues that this timeframe is at odds with the dictionary definition of "imminent" as

meaning "about to happen."  (Siemens Mot. 25-26 (citing *Oxford Concise Dictionary* (2d

ed. 1989).)

Commissioner Pinkert's determination was supported by substantial

evidence and in accordance with law.  A six to nine month timeframe is sufficiently

imminent to support a threat determination.  Although "[n]o bright-line test exists to

determine when injury is imminent", this court has found timeframes longer than "six to

nine months" to be "imminent."  *Asociacion de Productores de Salmon y Trucha de

Chile A.G. v. USITC*, 26 CIT 29, 39, 180 F. Supp. 2d 1360, 1371 (2002) (rejecting

arguments that imminent "cannot mean within one to two years"); *accord Goss Graphics System, Inc. v. United States*, 22 CIT 983, 1007-08, 33 F. Supp. 2d 1082, 1103-04 (1998) (upholding as reasonable finding that harm was imminent where it would manifest in two or more years); *see also Co-Steel Raritan, Inc. v. USITC*, 29 CIT 562, 570-71 (2005).  Further Commissioner Pinkert cited hearing testimony to support his finding that competition with subject imports would increase within a "six to nine month" timeframe.  *Pinkert Views* at 6-7 n.27 (citing Hr'g Tr. (Smith) at 80).  That Plaintiffs can point to record evidence that supports a different timeframe is of no moment.  *See Matsushita*, 750 F.2d at 936.

### b.  Tax Credit Renewal

Plaintiffs also argue that Commissioner Pinkert improperly speculated that significant subject import volumes during interim 2012 represented a trend, urging that 2012 was actually a unique year during which domestic producers could not satisfy demand.  (Siemens Mot. 27-29, 34-35; Titan Mot. 48-49.)  Plaintiffs contend that the looming expiration of the PTC and investment tax credit drove 2012's spike in demand, (Siemens Mot. 27-29, 34-35; Titan Mot. 48-49), and that Commissioner Pinkert wrongfully assumed that the renewal of these tax credits would lead to continued high demand.  (Siemens Mot. 17-18, 27-29, 34-35; Titan Mot. 48-49.)  They assert that the renewal could not produce the same level of demand as existed in interim 2012 because the tax credits' terms changed for 2013.  (Siemens Mot. 17-18, 27-29, 34-35; Titan Mot. 48-49.)  In contrast to the 2012 tax credits, the 2013 tax credits required that projects be commenced, not that orders be placed, by the end of the year to qualify.

(Siemens Mot. 17-18, 27-29, 34-35; Titan Mot. 48-49.)  Therefore, Plaintiffs assert that

projects commenced in 2013 "[m]ight never be finished, depending upon the economic

circumstances and prospects for grid parity."  (Siemens Mot. 29.)  Plaintiffs thus

contend that Commissioner Pinkert's determination about demand trends in the

imminent future was inherently speculative and conjectural.  (*See* Siemens Mot. 29.)

Commissioner Pinkert used an accepted methodology and relied on

substantial evidence to support his determination that the renewal of the tax credits

would spur further demand.  The court has repeatedly upheld reliance on trends as

constituting substantial evidence in support of a threat of material injury determination.

*See Asociacion de Productores*, 26 CIT at 38, 180 F. Supp. 2d at 1370 (holding that

trend data showing imminent increase in import volumes constituted substantial

evidence to support Commission's threat finding); *see also Bando Chem. Indus., Ltd. v.

United States*, 17 CIT 798, 807 (1993), *aff'd*, 26 F.3d 139 (Fed. Cir. 1994) (finding that

the Commission reasonably inferred from trend data that increased foreign production

was likely destined for U.S. market).  Commissioner Pinkert thus reasonably relied on

substantial record evidence of trends showing, *inter alia*, increased volumes, market

share, and excess capacity among foreign producers as evidence of a threat of

imminent material injury to the domestic industry.

### c.  Factors for Finding Threat of Material Injury

Finally, Plaintiffs challenge Commissioner Pinkert's weighing of the

statutory factors for examining whether there is a threat of material injury.  (Siemens

Mot. 39-42; Titan Mot. 48-52.)  They argue that no substantial evidence supports

Commissioner Pinkert's findings that (i) the surge in subject import volume would continue after interim 2012; (ii) subject imports had an expanding presence in the U.S. market; (iii) foreign producers had excess capacity; (iv) foreign producers had significant end-of-year inventories poised for the U.S. market; and (v) subject imports would have future price effects on the domestic industry.

### i.  Volume After Interim 2012

With respect to Plaintiffs' argument that the interim 2012 surge in volume was an anomaly, as discussed previously, Commissioner Pinkert reasonably relied on the trend in subject import volumes at the end of the POI in assessing whether a threat of material injury existed to the domestic market.  *See Asociacion de Productores*, 26 CIT at 38, 180 F. Supp. 2d at 1370; *Bando Chem.*, 17 CIT at 807.  In particular, Commissioner Pinkert identified substantial evidence to support his determination that subject import volumes were trending upward.[18]  He noted that most of this surge occurred late in the period of investigation and came at the expense of the domestic industry.  *Pinkert Views* at 3-4 (citing *Staff Report* at Table C-1).  He also addressed the absence of future orders, explaining that record data was compiled before the renewal of the tax credits and that purchasers would have been reluctant to place orders until after that situation had been clarified.  *Pinkert Views* at 6-7 n.27 (citing Hr'g Tr. (Smith) 80).  He reasoned that, with the renewal of the PTC and investment tax credit for

_____

[18] Commissioner Pinkert observed that shipments of subject imports were [[      ]] percent higher in interim 2012 than in interim 2011.  *Pinkert Views* at 3-4 (citing *Staff Report* at Table C-1).

construction projects beginning in 2013, "purchasers are necessarily compelled to act quickly to place orders, likely resulting in intense competition for the reduced volume of sales and likely negatively impacting domestic producers in the imminent time frame." *Pinkert's Views* at 6-7 n.27 (citing Hr'g Tr. (Smith) 80).

While Plaintiffs have a point that the situation in 2013 will differ from that in 2012 with the changes in the two tax credits, Commissioner Pinkert had to make a determination on the basis of the record that was before him.  While discussing the future is inherently uncertain, Commissioner Pinkert tied his findings with regard to the future to the facts of record as they existed at the time he was making his determination. On that basis, Commissioner Pinkert relied on substantial record evidence in finding that subject import volumes would remain high in the imminent future.

### ii. Expanding Presence

In weighing the statutory factors for threat of material injury, Commissioner Pinkert reasoned,

> There is no reason to believe that the subject exporters, having expanded their presence in the U.S. market so significantly, beginning in 2011 and accelerating in 2012, including in the central region of the country where they might be expected not to be fully competitive due to transportation costs and logistical difficulties, would, in the absence of trade relief, relinquish it by not competing in the imminent future to their fullest abilities in all regions of the U.S. market.

*Pinkert Views* at 4.  Plaintiffs contend that Commissioner Pinkert lacked substantial evidence to support this conclusion.  (Siemens Mot. 38; Titan Mot. 49.)  They argue that OEMs had no choice but to rely on subject imports because domestic producers routinely defaulted and rejected orders.  (Siemens Mot. 38; Titan Mot. 49.)  With less

demand after interim 2012, they urge, OEMs are likely to return to their preferred

practice of sourcing from domestic producers.  (Titan Mot. 49.)

   Contrary to Plaintiffs' contentions, Commissioner Pinkert reasonably found

substantial record evidence that subject imports had an expanding presence in the U.S.

market.  He noted that purchases and installations of subject imports increased

significantly at the end of the POI, even in regions where Plaintiffs argue subject imports

do not compete with domestic wind towers.  *Pinkert Views* at 4 (citing Siemens Post-

Hr'g Br. at 1, 8-10; Foreign Resp'ts Final Comments, at 11-12 & n.43; *Staff Report* at

Tables V-1, V-5).[19]  Moreover, as previously discussed, Commissioner Pinkert identified

record evidence indicating that the domestic industry's operational inefficiencies could

not account for the full surge in subject import volume at the end of the POI, and that

OEMs caused these inefficiencies in some cases by renegotiating contracts in favor of

purchasing more subject imports.  Thus, Commissioner Pinkert based his finding of

expanding presence of subject imports at the end of the POI on substantial evidence.

### iii. Excess Capacity

   As part of his threat determination, Commissioner Pinkert found that "the

Chinese and Vietnamese industries have significant unused capacity for the production

of wind towers that they can use to export to the United States in the imminent future."

---

[19] For example, he found that subject imports sold in Midwestern states grew substantially over prior years to [[     ]] units in all of 2011 and then surged to [[     ]] units in the first six months of 2012.  Similarly, he found that the number of subject imports sales in the region consisting of Texas, Oklahoma, New Mexico, and Arizona grew from [[     ]] units in all of 2010 to [[     ]] units during interim 2012.  *Pinkert Views* at 4 (citing *Staff Report* at Tables V-1, V-5).

*Pinkert Views* at 5 (citing *Staff Report* at Table VII-6; Pet'r's Post-Conf. Br. at Ex. 2).  He

based this finding on data from foreign producers showing significantly increased

capacity between 2009 and 2012 and no projection that this capacity would fall in 2013.

*Pinkert Views* at 4-5 (citing *Staff Report* at Table VII-6).

        Titan argues that Commissioner Pinkert lacked substantial evidence to

support this determination.  (Titan Mot. 50.)  It asserts that foreign producers reported

theoretical data on capacity when they were actually already operating at full capacity.

(Titan Mot. 50.)  It further contends that foreign producers with capacity cannot ship in

the absence of orders, and that OEMs prefer to purchase from domestic producers.

(Titan Mot. 50.)

        Commissioner Pinkert cited certified data from Chinese and Vietnamese

producers about their capacity to support his conclusion.  *See Pinkert Views* at 4-5

(citing *Staff Report* at Table VII-6).  This data constituted substantial evidence that

foreign producers had increased their capacity in recent years; that their capacity

utilization was falling across the period; and that, as a result, they had significant excess

capacity that they could use to export additional volumes of subject imports to the

United States.  *See Pinkert Views* at 5 (citing *Staff Report* at Table VII-6).  Although

Titan argues that the data relied upon was reported on a theoretical basis, it has failed

to support this contention with record evidence.  In fact, Titan merely cites to the general

questionnaire responses of the foreign producers without any further support for its

theory that the data is theoretical.  (Titan Mot. 50.)  Thus, Titan has not established that

Commissioner Pinkert's findings on excess capacity were unreasonable or unsupported by substantial evidence.

### iv. End-of-Year Inventories

Commissioner Pinkert also found that foreign producers had significant end-of-year inventories poised for the U.S. market.  Plaintiffs argue that this conclusion is not supported by substantial evidence.  (Siemens Mot. 30, 34-36, 40; Titan Mot. 50-51.)  They explain that foreign producers inaccurately reported as "inventory" "made to order" towers that had already been sold.  (Siemens Mot. 30, 34-36, 40; Titan Mot. 50-51.)

Commissioner Pinkert considered the made-to-order nature of wind towers but also noted that they are not necessarily custom-made.  *Pinkert Views* at 5-6 n.23 (citing *Staff Report* at Tables VII-2, VII-4, VII-8).  Moreover, the record showed that at least on one occasion, a foreign producer used subject towers in its inventory that were made-to-order for one project for a different project.  (*See Staff Report* at V-48.)  Thus, Commissioner Pinkert's consideration of the subject producers' end-of-period inventories was reasonable and the existence of contradictory record evidence does not indicate that Commissioner Pinkert's determination was not supported by substantial evidence.  *See Armstrong Bros.*, 626 F.2d at 170 n.4.  Further, the statutory factors for assessing threat of material injury must be considered "as a whole," such that even if there were a weakness in the analysis of any one factor, it does not impeach the overall determination.  *See* 19 U.S.C. § 1677(7)(F)(ii).

### v. Price Effects

Commissioner Pinkert found that the price gap between subject imports and domestic products narrowed at the end of the POI and he anticipated that prices of subject imports would continue to fall as demand moderated in 2013. *Pinkert Views* at 7 (citing *Staff Report* at Tables V-2, V-6). He reasoned that competition would intensify, pushing down prices and adversely affecting an already vulnerable domestic industry. *Id.*

Plaintiffs assert that this finding is speculative because OEMs likely would return to their preferred practice of purchasing from domestic producers to obtain their base load requirements if demand moderated and domestic producers could meet such demand. (Titan Mot. 52.) They also argue that Commissioner Pinkert's finding of a narrowing price gap lacks substantial evidentiary support because the record shows that import prices were consistently higher than domestic prices on a delivered basis. (Siemens Mot. 39; Titan Mot. 51.) Siemens further contends that Commissioner Pinkert's finding of future price suppression is contrary to law because the Tariff Act requires that price suppression be found in the present. (Siemens Mot. 40 (citing 19 U.S.C. § 1677(7)(F)(iv) ("[Subject imports] are entering at prices that are likely to have a significant depressing or suppressing effect on domestic prices, and are likely to increase demand for further imports.")

Commissioner Pinkert reasonably found evidence of future price effects. He observed that the domestic industry's operating income margin declined from 2009 to 2011 and [[                    ]] in interim 2012, even as U.S. consumption of wind

towers peaked.[20]  Further, Commissioner Pinkert cited record evidence that the gap in

prices between subject imports and the domestic like product fell from 2009 to interim

2012.[21]  He reasoned that, in the context of increased subject imports and moderate

demand growth, subject import producers would further lower prices, exerting additional

downward pressures on domestic prices.  *Pinkert Views* at 8.  Commissioner Pinkert

noted that several domestic producers had already shuttered plants or switched to other

products in interim 2012.  *Pinkert Views* at 8 (citing *Staff Report* at III-1 to III-2).

　　　　　Commissioner Pinkert thus concluded that subject imports were likely to

have negative price effects on the domestic industry.  Contrary to Plaintiffs' contentions,

Commissioner Pinkert reasonably extrapolated future price effects from these end-of-

POI trends.  *See*, *e.g.*, *Goss*, 22 CIT at 1002-03, 33 F. Supp. 2d at 1099-1100 (affirming

Commission determination that small number of sales likely to be awarded in imminent

future would "likely result in intense competition among domestic and foreign suppliers

for bid awards. Moreover, this intensified competition for a smaller pool of sales

opportunities increases the incentive for suppliers of [subject] imports to compete on the

basis of price.").  Because Commissioner Pinkert supported his trend findings with

substantial evidence, the court will not reweigh the evidence or substitute its judgment

for the Commissioner's.  *Usinor*, 28 CIT at 1111, 342 F. Supp. 2d at 1272.

---

[20] Specifically, the domestic industry's operating income margin fell from [[    ]] percent
in 2009, to only [[    ]] percent in 2011 and to [[                ]] in interim 2012.
*Pinkert Views* at 8 (citing *Staff Report* at Tables C-1, C-2).
[21] In particular, Commissioner Pinkert found that the price gap shrunk from 28 percent in
2009-2011 to 11.2 percent in interim 2012.  *Pinkert Views* at 7 (citing *Staff Report* at
Tables V-2, V-6).

## CONCLUSION

For the reasons provided above, the court denies Plaintiffs' motions for

judgment on the agency record.

 /s/  Mark A. Barnett____
Mark A. Barnett
Judge

Dated: June __17__, 2014
New York, New York